WILLIAM RIDDLE, complainant and appellant,

*v.*

JOSEPH F. CLABBY, defendant and respondent.

[Filed November 20th, 1899.]

Whether, under the circumstances of this case, a right to the conveyance of an interest in land can be established by parol evidence, is not deemed necessary to decide, because, assuming it can be, the conclusion below that the parol evidence was insufficient to establish such right is not found to be erroneous.

On appeal from a decree advised by Vice-Chancellor Reed, who delivered the following opinion:

Mr. Benjamin H. Brown, president of the United States Hotel Company, put in the hands of William Riddle, a real estate dealer and broker, certain property belonging to the United States Hotel Company for sale, at the price of $30,000, on a commission of two per cent. Mr. Brown was informed by Mr. Riddle that he had sold the property to a Mr. Mason, and an agreement for the sale thereof to Mr. Mason was executed on April 24th, 1891, at which time $500 was paid down. This agreement was really made by Mr. Mason for William Riddle and Joseph F. Clabby, and to these gentlemen Mr. Mason assigned in writing his interest in the agreement. Subsequently a point was raised by Mr. Riddle in respect to the title which the United States Hotel Company was able to give, Mr. Riddle insisting that by the operation of certain deeds which the company had given for other lands, certain restrictions were imposed upon the use of the property in question. To avoid this alleged difficulty it was arranged that a mortgage upon this property, held by the Provident Life Insurance Company, which had been executed previous to the creation of the restrictions, should be foreclosed, and that the property sold under the foreclosure should be bought in by someone for Mr. Brown, who was then

to convey the title so purchased to Messrs. Riddle and Clabby. At the foreclosure sale the property was sold to one Mr. Shuster, who bought it in for Mr. Brown. Mr. Shuster, on October 12th, 1892, the day of the sale, made a new contract with Mr. Riddle and Mr. Clabby confirming the former one already made between the hotel company and these gentlemen.

The time named in the agreement for delivering the deed was October 29th, 1892, and the consideration, $30,000, was to be paid in the following manner: Five hundred dollars had been paid when the original agreement was executed. There was to be paid $7,000 in cash. One thousand dollars was to be allowed on account of rent for the property. There was to be a mortgage of $1,500, and another mortgage of $20,000, executed by the vendees to the vendors. On Saturday, October 29th, 1892, Mr. Shuster and Mr. Brown attended at the place of business of Mr. Clabby, at Atlantic City, for the purpose of passing the papers and settling the consideration. Mr. Riddle was sent for and subsequently appeared, and had some conversation with Mr. Clabby, which resulted in an arrangement that Mr. Clabby, with Mr. Riddle's consent, should take the title to the property alone, and that he alone should execute the bonds and mortgages. This required the execution of a new deed by Mr. Shuster, which new deed on the Monday following was executed, and the entire consideration was paid by and the title to the property taken in the name of Joseph F. Clabby.

The facts so far are not controverted. The litigation springs out of the difference between Messrs. Riddle and Clabby as to the purpose of this arrangement to put the title of this property in the name of Mr. Clabby alone, instead of in the name of Riddle and Clabby.

Mr. Clabby insists that Mr. Riddle abandoned his right to receive a deed because of his pecuniary embarrassment, and assented to Mr. Clabby's taking the entire title and paying the entire consideration.

Mr. Riddle insists that the reason that he did not take the undivided moiety of the property was because Mr. Clabby objected that his (Mr. Riddle's) domestic relations would embar-

rass the execution by him of the mortgages to be given at the time, or of any future deed which might be required to dispose of the property; and that it was understood that Mr. Clabby should take the title, arrange the consideration for their joint benefit, he to be subsequently reimbursed by Mr. Riddle for one-half the consideration.

At this point it is suggested, rather than argued, by the counsel for Mr. Clabby, that the agreement to make the title to Mr. Clabby alone cannot be proved by parol. That Mr. Riddle's interest in the agreement to convey an undivided moiety to him was an interest in lands which could not be transferred, because of the prohibition of the statute of frauds, by a verbal agreement.

If this view is tenable, then the agreement of Mr. Shuster to convey to both of these parties is still enforceable, but it seems obvious that upon a bill to compel such performance Mr. Riddle would be clearly estopped by his assent to the substituted performance. Estoppels in relation to sales of land usually lie in parol, and are based upon the fraud which would be perpetrated by a successful attempt of a person who, by his assent, has led opposing parties into a certain line of conduct to ignore such assent. The specific performance of verbal contracts for the sale of land, when there has been a part performance, rests upon this doctrine. After Mr. Riddle assented to the substituted performance of the contract to convey, and the conveyance was executed in conformity with his consent, he is estopped from invoking the provisions of the statute of frauds. *King* v. *Morford, Sax. 274; Stoutenburgh* v. *Tompkins, 1 Stock. 332.* The question is then narrowed to one fact, namely, as to which of these counter-contentions of Messrs. Riddle and Clabby is true, and the answer to this question depends upon what occurred on Saturday, October 29th, 1892, when Mr. Brown, with Mr. Shuster, came to Mr. Clabby's saloon, bringing with them the conveyance that was then to have been delivered.

At that meeting there were present, besides the two just mentioned, Mr. Riddle, Joseph F. Clabby, the defendant, Mr. Thomas Clabby, the defendant's brother, and Mr. Ormrod, the bar-tender.

Mr. Joseph F. Clabby's account is, that on that day, after the arrival of Messrs. Brown and Shuster, Mr. Riddle was sent for, came, had some conversation with Mr. Brown about the settlement of a due-bill for $60, and upon then being asked if he was prepared to go on with the purchase of the bath-house property said, "No; I am not prepared to go on; I haven't any money and cannot keep my part of this agreement, and it is off, so far as I am concerned; I want you to understand that I am out of it."

That he then called Mr. Thomas Clabby out into the corridor where they had some conversation, and where finally Mr. Joseph Clabby joined them, and found, as he says, Mr. Riddle trying to induce Thomas Clabby to go in with him in the purchase of the property, as he (Riddle) had abandoned it. Joseph F. Clabby says he again asked Riddle if he meant what he had said to Mr. Brown, and he said he did. And he said, "If you think it is a good thing, go in and take it yourself; but if you do conclude to buy it, there is one thing I would like you to do for me." And I said, "What is that?" And he said, "I want you to give me credit for the $250 which I have paid on the Mason agreement, and release me from that amount." I told him if I purchased the property I would do so.

Mr. Riddle came back into the room and said to Mr. Brown, "That if Mr. Clabby should purchase the property, I want you to give him credit for the $250 which I have paid on the Mason agreement; and as I owe him $250, he released me from that amount."

Mr. Clabby says he then concluded to take the property, wrote his check for $7,000, and took it to the bank and bought two drafts, one for $6,400 and the other for $600, on the Mechanics Bank of Philadelphia. Six hundred dollars was deducted from the consideration on account of the commissions which Mr. Brown had promised to pay Mr. Riddle and which Mr. Brown allowed to Clabby on the sale. Therefore only the $6,400 draft was passed over, and the newly-executed deed was passed over on the Monday following.

This states substantially the account given by Joseph F. Clabby of what occurred on the 29th and 31st of October, 1892.

Riddle *v.* Clabby.

Mr. Thomas Clabby, who was present on the 29th of October, and went for Mr. Riddle, to inform him that his presence was required, corroborated the testimony of his brother with some immaterial variations.    He says, that after Mr. Riddle had announced that he had not got the money and refused to go any further in the matter, that he took witness outside the door and asked him why he did not take the one-half interest; that if he did he wished him to get credit for the $250 which he (Riddle) had paid to Mr Brown on the original Mason agreement.    Thomas Clabby also says that he loaned his brother $250 on that day to make a deposit for the benefit of his balance in bank.

On the other side, Mr. Riddle's account of what occurred on the 29th of October is, that he was at Heckler's Hotel, the head-quarters of the Democratic committee, and when word was sent to him that Mr. Brown and Mr. Shuster were prepared to make the deed, he went to Mr. Clabby's saloon, and upstairs to the second story. · That he drew Mr. Joseph F. Clabby aside, and took him half way downstairs, and said :

"Joe, the county committeemen have got to take their trains to the various distant points, and if they do not get their trains this afternoon, I would not have a chance to do what I should do politically for these people; and I said, it will take me a good while to make this settlement; can you make this settlement without my being here?    You have the $5,000 mortgage which I gave you in June: however, if you are not willing to do this, I have the money downstairs, but it was in bills of small denominations, one and two dollar bills, and I had a considerable amount of money in one and two dollar bills, and could have readily gone and gotten the money and brought it upstairs, but he was an earnest political supporter of mine, and he was very anxious for me to go and settle with the committeemen;"

and he said, "Go ahead, Bill, I will wait for you until the day after the election."    In recognition of that, I said :

"There is a $600 commission coming to me from Mr. Brown, and I will give you one-half of that commission; and I then walked upstairs to where Mr. Brown and Mr. Shuster were sitting, and they asked if I were ready to settle, and I said yes, we were ready to settle in everything but one particular; Mr. Clabby has the money, and the one particular is, that he don't want me to go on the bond and mortgage, because of some domestic criticisms on my titles; I was perfectly willing to go on the bond and mortgage, and so told them then

37

and there, but that Mr. Clabby preferred to take the title of the deed himself, and hold it for my benefit, and not cloud the title in any way; I said, ' Mr. Brown, you will allow the $600 credit on this settlement, and I will give you a receipt in full for the commissions for the sale of this property:' after some conversation with Mr. Brown about the $60 which Mr. Riddle owed him for overpaid commissions, he says he left the room."

Another witness is Mr. Brown. Mr. Brown was asked if he knew why Mr. Riddle's name was not put in the deed, and replied, " Well, I think it was on account of Mr. Riddle's wife, or something of that kind, that probably he could not make a good deed—a good title." He was asked if that was the reason, and replied :

" I don't know whether that was the entire reason or not, but that was one of the things talked about at the time.
"Q. Was there any other reason that you know of?
"A. No, sir."

He also says he supposed that Mr. Riddle had some interest in the title.

Mr. Shuster was asked :

" Did you understand why it was you executed the deed to Mr. Clabby alone?
"A. My understanding was this: there was a conversation between Mr. Clabby and Mr. Riddle, and for some domestic reasons—I learned afterwards, for fear of a common-law marriage—Mr. Clabby did not consider it safe for them to have a joint title and joint deed.
"Q. Did you hear that statement?
"A. Yes, sir; I heard them talk about it; they came to me for that reason to make the title as I did.
"Q. State how it was you received your impression. Who did you hear say so?
"A. Mr. Clabby and Mr. Riddle; that is the only information I have; they were together when I heard the conversation."

This is substantially all the testimony in respect to what occurred on October 29th. In passing upon the force to be given the testimony of these witnesses, it has to be kept in mind that they are trying to recall the words spoken in October, 1892. The recollection of the precise words employed in a conversation

Riddle *v.* Clabby.

occurring so long ago must at best be vague.   At the time the conversation occurred, none of the witnesses supposed that the language used would become of subsequent importance.   Therefore, the unconscious influence of present interest, and the impressions perhaps gained by subsequent conversations by the witnesses with the parties, is liable to color any statement of what then occurred.   The testimony of the two Messrs. Clabby, as to the exact words used at that time, is probably their present recollection of what was likely to occur.   But their account of the substance of the conversations, the purposes and the result of the conversations, may be accurate.   It can at least be said of their statements that nothing is proven in the case in respect to their subsequent conduct or conversation which is inconsistent with the account which they now give of the arrangement of October 29th.

Of the witnesses produced in support of Mr. Riddle's theory, it is to be remarked that Mr. Brown, a gentleman of character and probity, has now, and undoubtedly had then, the infirmity of age and deafness, which, added to the natural infirmity of memory, renders his testimony as to the conversations which occurred on the 29th of October extremely uncertain.

In respect to Mr. Shuster, although he swears definitely to a conversation between Mr. Riddle and Mr. Clabby, from which he says he got the impression that Mr. Riddle was left out of the deal because of domestic difficulties, I am not convinced that he has a recollection of a conversation to that effect between the parties.   He remembers nothing of the transaction apart from that; in fact, neither he nor Mr. Brown recalls the fact that the deeds originally prepared were not delivered, and that he, Mr. Shuster, was compelled to execute a new deed, which was delivered in fact on the Monday following.

The impression which they say was left upon their minds from the conversation which then occurred was perhaps the result of subsequent conversations and reports.

In turning to the testimony of Mr. Riddle it is to be viewed in the light of subsequent conversations and conduct.   He says that the day after election (November 9th) he went to the

saloon of Mr. Clabby and said, "Joe, you can prepare the deed for me; I have my money ready to settle for my half of the property."

Mr. Clabby answered, "It will do to-morrow." On the morrow Mr. Riddle says he went and said, "I am ready, Joe; I have the money here." Mr. Clabby said, "Well, I do not feel as if I want to have any partners in this transaction." I said, "What do you mean?" He made no reply, but "that he did not want any partners."

Now, Mr. Riddle says that he had the money to pay his share on October 29th as well as on November 9th, and yet on November 1st he borrowed of Mr. Clabby $350.

Again, after November 10th, when, according to Mr. Riddle, Mr. Clabby had deliberately announced his intention of ignoring his agreement of October 29th and of cutting Mr. Riddle entirely out of all rights in the property, the latter seems to have continued in friendly relations with Mr. Clabby. On July 14th, 1892, Mr. Riddle had given Mr. Clabby a due-bill for $2,172.10 and $250, with interest. In May, 1893, they had a settlement of accounts, when Mr. Riddle paid Mr. Clabby a check of $178.77, another for $60, a draft for $2,000 and another for $80. At the same time he gave Mr. Clabby a certificate that he held five shares of the Union National Bank stock belonging to Mr. Clabby, which he was to deliver in ninety days, or $500 in lieu of the same.

It appears that after the failure of Mr. Riddle to return this certificate of stock or pay the $500, Mr. Clabby, in the beginning of 1894, began an action against him to recover the money. A judgment was entered by default. Mr. Riddle applied to have the judgment opened, and testimony was taken before Robert H. Ingersoll on May 21st, 1894. Mr. Riddle then swore "that he first discovered that his name had been omitted from the deed taken by Mr. Clabby when he went to proffer him the balance for his one-half interest." He said "that he could tell that Clabby had the title by his manner." He said, "I was not certain how the transaction was concluded."

In answer to the question, "Why was the title made to Mr.

Clabby instead of to you," he answered, "I don't know." He now says that he knew that the title was to be taken by Mr. Clabby alone, and why it was to be so taken, namely, because Mr. Clabby preferred to take the title himself, because of some criticisms of his (Riddle's) titles.

Now, the testimony taken in May, 1894, upon the very point of inquiry, is radically variant from that of October, 1897.

Again, from the time when, according to Mr. Riddle, Mr. Clabby had violated his agreement with him and announced his intention to deprive him of his rights in the property, there had been friendly dealings. Mr. Clabby had loaned his money; that had settled, in May, 1893, their accounts; suit had been brought against Mr. Riddle in 1894, and not until August 6th, 1895, did Mr. Riddle begin this suit.

Again, Mr. Charles Idler rented desk room to Mr. Riddle during the years 1893 and part of the years 1892 and 1894. Messrs. Riddle, Lafferty and Idler wanted to get an option on this property from Mr. Clabby, and sent Mr. Idler to see Mr. Clabby. Mr. Idler says Mr. Clabby wanted for the property $50,000, and would give us an option if we would put up $500. He says that Mr. Riddle and Mr. Lafferty sent witness back to see if he could get the option without the $500. Mr. Clabby refused. Mr. Idler testifies that Mr. Riddle said that at the time he was about to buy that property with Mr. Clabby, but he could not raise the money, and the thing fell through, or something to that effect.

As to the testimony in respect to other admissions of Mr. Riddle, subsequent to October 29th, seeming to recognize Mr. Clabby's title, the liability to mistake in reproducing the conversations is such that I have not given them serious consideration.

I am unable to find much light in the testimony, and the argument based upon it, in respect to the charge of the principal and interest of the sum of $250, in the memorandas made by Mr. Clabby, and the credit of the same sum in the same memoranda, upon the basis of which the settlement of May, 1893, was made. There seems to be a good deal of confusion in the testimony in respect to this $250. I think that the loan of $250 evidenced

by the check of July 13th was the same loan referred to in the due-bill of July 14th, 1892. That loan seems to have been carried into the account against Mr. Riddle, and interest calculated, and the $250 which represented the one-half of the $500 deposited on the Mason agreement without interest, seems to have been allowed as a credit.

In my judgment, under the testimony, the relief asked for by the complainant must be denied. Nor can I see any way of impressing a trust upon the property, on account of the $600 commissions, which was originally due to Mr. Riddle, and which was deducted from the consideration at the time of the execution of deeds. If it was understood that Mr. Clabby should take the entire legal title, and this money should be used as part of the consideration, no resulting trust arose in favor of Mr. Riddle.

*Mr. Lindley M. Garrison,* for the appellant.

*Mr. Clarence Cole,* for the respondent.

The opinion of the court was delivered by

MAGIE, CHIEF-JUSTICE.

The case presented for adjudication is so completely stated in the opinion of Vice-Chancellor Reed, upon which the decree appealed from was made, that it need not be here repeated.

It appears therefrom, without any contradiction, that the agreement of Brown to convey certain land to Riddle and Clabby, the parties to this litigation, upon their paying the consideration, part in cash on the delivery of the deed and part at a future day secured by the bond of Riddle and Clabby and a mortgage on the land, was performed on the part of Brown by the conveyance of the land to Clabby alone, and on the part of the purchasers by a cash payment by Clabby of such part of the sum to be paid in cash as Brown was willing to receive, and by a bond and mortgage upon the land made by Clabby alone. This substituted performance was expressly assented to by Riddle, but his assent was by parol.

Riddle *v.* Clabby.

It is obvious, however, that by his conduct, in having assented to the conveyance to Clabby alone, he was estopped from making any claim to a conveyance from Brown, and, by his assenting to Clabby's contracting to pay the whole of the deferred payments of the consideration, from asserting as against Clabby any adverse claim to the land arising from such conveyance. Riddle's claim of a right to a conveyance from Clabby of an undivided half of the land must therefore rest either upon a trust arising from the transaction or from an agreement on the part of Clabby.

Riddle has produced no trust or agreement expressed in writing by Clabby.

No trust arose by his paying or securing to Clabby one-half of the purchase price of the land, for he did not do so. While he permitted Clabby to use his commissions of $600, which Brown owed him, to make up part of the cash payment, such use was correctly held by the vice-chancellor not to create a trust for an undivided half of the land.

The vice-chancellor, however, conceded that the agreement by Clabby to convey the undivided half of the land to Riddle, could, under the circumstances, be established by parol evidence and was not within the statute of frauds.

I deem it unnecessary to pronounce upon the correctness of this view, for, assuming it to be correct, the parol evidence adduced was held by the vice-chancellor to be insufficient to make out such an agreement, and as the evidence was extremely contradictory, and as the decision thereon must have depended upon the credit given to the witnesses, I feel unable to say that the vice-chancellor who saw and heard the witnesses was wrong in his conclusion.

For this reason, I shall vote to affirm the decree.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, VAN SYCKEL, GUMMERE, COLLINS, LIPPINCOTT, HENDRICKSON, ADAMS, NIXON, VREDENBURGH—10.

*For reversal*—DIXON, GARRISON, LUDLOW, BOGERT—4.